IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 25, 2002

## STATE OF TENNESSEE v. CHARLES W. WELLMAN

**Direct Appeal from the Circuit Court for Blount County**
**No. C-12729     D. Kelly Thomas, Jr., Judge**

_____

**No. E2001-03055-CCA-R3-CD**
**March 4, 2003**
_____

The defendant was convicted of assault, a Class A misdemeanor, in violation of Tennessee Code Annotated section 39-13-101 and sentenced to eleven months, twenty-nine days, with ninety days to be served in the county jail and the remainder on supervised probation. On appeal, in addition to challenging the sufficiency of the evidence, he argues that the trial court imposed an excessive sentence and erred by ordering that he serve ninety days in confinement. We conclude that the evidence is sufficient to support the conviction and the record supports the trial court's sentencing determinations. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

Steve McEwen, Mountain City, Tennessee (on appeal); Raymond Mack Garner, District Public Defender; and George H. Waters, Assistant District Public Defender (at trial), for the appellant, Charles W. Wellman.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Ellen L. Berez, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On Friday evening, March 31, 2000, the defendant, Charles W. Wellman, became involved in a child visitation dispute between his wife, Deborah Wellman, and her ex-husband, Howard Wolever, Sr., the victim. Mrs. Wellman and the victim had two children together, thirteen-year-old twins Jennifer and Howard, Jr., who were scheduled to have weekend visitation with the victim beginning that evening and ending Sunday night. Earlier that afternoon, however, the children had

informed their father that because they had other plans, they would not be arriving until 2:30 or 3:00 Saturday afternoon and would be leaving at about 10:00 Sunday morning. Angry that his visitation had been cut short, the victim told the children that if they were not going to come for their scheduled full weekend visitations, they should not bother visiting him at all. The victim's ultimatum upset the children, which in turn upset Mrs. Wellman, who reacted by driving to the victim's home to confront him over his treatment of their children. Knowing where she was headed, the defendant and Mrs. Wellman's two older sons intercepted her on the road near the victim's residence and then accompanied her to the victim's mobile home. Once there, an argument with the victim, initiated by Mrs. Wellman and her sons, escalated into a physical altercation between the defendant and the victim.

## Trial

The victim testified at the defendant's trial that his daughter Jennifer's telephone call upset him because that was not the first time his weekend visitation with the children had been altered. She hung up on him when he told her not to bother visiting, and he then hung up on his son when Howard, Jr. called back to talk about the ultimatum. The victim said he had begun to calm down when he heard a loud pounding at his door at about 7:30 p.m. as he, his wife, and their two small children were having dinner. When he went to the door, he saw Mrs. Wellman and her two sons from a previous marriage, seventeen-year-old Sam Graves, Jr., and his brother Michael, standing beside the victim's car, which was parked perpendicular to the door of the trailer. The victim explained that he backed his car against the trailer so that he and his family could climb onto the trunk to gain access into the house, as the door of the trailer was approximately three feet above the ground and the trailer had no steps.

Mrs. Wellman and her sons began yelling when the victim appeared at the door, with Mrs. Wellman demanding to know what he had done to their children. The victim admitted he yelled back, and curses were exchanged. Next, he said, Sam Graves pushed Mrs. Wellman's arm aside,[1] ran toward the trailer, and started to jump onto the trunk of the car. The victim said he responded to Graves's threatening approach by stepping out onto the trunk of his car in order to protect his home and family, since he was not "real sure of getting the house secure to where no one could get in, in time." As he was stepping out of the house, he saw the defendant rushing forward from the shadows. Deciding that he "needed to get rid of somebody quick," the victim kicked Graves in the side of the head as he was climbing up onto the trunk of the car. At about the same time, the defendant came over the hood onto the roof of the car and "dropkicked" the victim in the left knee with his right foot, which resulted in the defendant's falling backwards onto the roof of the car and the victim's falling to the ground.

The victim testified that as he lay on his left side on the ground, the defendant straddled his body, pulled his head up by his shirt collar, and punched him in the face, saying, "That will teach you

---

[1] From the victim's later testimony, it appears that Mrs. Wellman was standing in front of her sons with her arms extended, attempting to keep them from approaching the victim.

to say anything about my wife." The victim said he asked his wife to call the police and then tried to stand, only to have his left leg collapse underneath him. He therefore asked his wife to call for an ambulance as well. Asked to describe his injuries, the victim testified that all the major ligaments in his knee were torn, he had an abrasion to the top of his head caused by his fall from the car, he suffered a slight concussion, and his nose was fractured.[2] He underwent one surgery to repair his nasal fracture and another surgery to restore his knee. It was nine months, however, before he was able to function without the use of a crutch or a cane. He was positive that the defendant, not Sam Graves, caused all of his injuries.

The victim acknowledged Mrs. Wellman had taken out an order of protection against him approximately eighteen months prior to the incident at issue in this case, due to his having struck her in the side of the head with his closed fist. He explained the circumstances of that incident as follows: his current wife had temporarily left him, taking their two small children, Eviva and Xavier, with her, and leaving him no information regarding their whereabouts. Knowing that she had a dental appointment scheduled at a certain time, he went to her dentist's office, where he found Mrs. Wellman with her. When he picked up Xavier in his car seat with the intention of taking his children home, Mrs. Wellman grabbed the car seat from his hand, endangering Xavier in the process. He grabbed the child back, and Mrs. Wellman then yanked the car seat again, nearly toppling Xavier over. At that point, he struck her to make her leave his child alone. The victim said he had undergone twenty-six weeks of anger management therapy as a result of the order of protection, and that he had never violated the order.

The victim testified he had learned after the incident at the dental office that the defendant and Mrs. Wellman had taken his wife and two young children into their home. He said that Mrs. Wellman, who was "constantly trying to provoke something," had convinced his wife to move in with them, telling her that she and the defendant would help take care of her and the children. His wife had stayed with the Wellmans for five or six months and then briefly moved into her own apartment before returning with the children home to him. The victim denied that he had ever been physically violent with his present wife and described their current relationship as "excellent."

When the incident began at his home, the victim was drinking his second rum and coke. He did not believe he was drunk, but could not testify with certainty that he was not. Although he initially denied that he had encouraged Sam Graves to come onto the car by challenging him to fight, he later testified that he could not be sure of what he might have said during the heated verbal exchange that occurred before the physical altercation began. The victim said that if he failed to tell the police officer who took his initial statement that he had kicked Graves, or that the defendant had kicked him in the knee, it was because he was still disoriented at the time he gave the statement. He said that Graves had not filed any charges against him as a result of the incident.

---

[2] Through the victim's testimony, photographs of his injuries were admitted into evidence and published to the jury.

-3-

The victim's wife, twenty-five-year-old Catherine Wolever, testified that she had been married to the forty-four-year-old victim for seven years and that, in the beginning, their marriage was somewhat "rocky" because she was so young and "wanted to do stupid things." During one rough spot, she had taken her children and left the victim, moving in with the defendant and Mrs. Wellman because her mother would not allow her to move back home with her. She and her children stayed in the Wellmans' home for about six months, until she "guess[ed] [she] wore out [her] welcome." The Wellmans then helped her get her own apartment, where she stayed briefly before moving in with a friend and then ultimately back with the victim. Although she and the victim had had arguments, he had never hit her or threatened her with physical violence. She described the victim as passive unless provoked, but capable of getting very angry when provoked.

Mrs. Wolever testified it was approximately an hour after the victim had cancelled his children's visitation that they heard a loud bang at their front door. When she looked out the window, she saw Mrs. Wellman and Sam and Michael Graves, but not the defendant. The victim went to the door and she could hear talking, but not what was being said. The victim then jumped out the door onto the car. After ensuring that her toddlers did not follow, Mrs. Wolever went to the door and saw the defendant crouching over the victim, who was lying on the ground. The defendant was holding the victim's shirt collar in his left hand and appeared to be in the process of hitting the victim. When she returned to the door after telephoning for the police and an ambulance, she saw Mrs. Wellman, the defendant, and Sam and Michael Graves returning to their cars. Mrs. Wolever acknowledged she had no idea who started the fight or what occurred prior to the time she witnessed the defendant crouched in a punching motion over the victim.

Officer Allen Russell, who responded to the report of the assault, testified that the victim was still lying on the ground beside the vehicle when he arrived at the scene. The victim had a laceration on the top of his head and a swollen left eye that was turning black. In addition, he was holding his leg and appeared to be in a great deal of pain. When he asked the victim what had happened, the victim reported that he had been assaulted by the defendant. Officer Russell determined from talking to the victim that other individuals, who were not involved in the actual assault, had been present at the scene. He did not question the victim about Sam Graves's role in the incident, and, as he recalled, the victim had not volunteered any information about Graves.

The victim's orthopedic surgeon, Dr. Michael Eilerman, testified that three of the four major ligaments in the victim's left knee were ruptured, and there was some damage to the fourth ligament as well. He performed reconstructive surgery on the knee, and the victim underwent intensive rehabilitation and physical therapy after surgery. Although the victim had made a good recovery, Dr. Eilerman thought he would suffer some permanent impairment as a result of the injury. Dr. Eilerman testified that the injury was consistent with the victim's having been kicked in the front of the knee, but conceded on cross-examination that the injury could have occurred in a number of different ways, including by the weight of a body falling against the knee.

Nineteen-year-old Sam Graves, Jr., testifying on the defendant's behalf, said that the altercation started when the victim cursed his mother and Graves cursed him back. That led to

"words" being "spoken," with the victim standing on top of his car and telling Graves to come on up and he would "kick [his] ass." Graves testified that the victim was standing on top of the car and he was standing beside the car when the victim kicked him in the side of the head. In response, he pulled the victim down to the ground and they began fighting. During the fight, which he estimated went on for about ten minutes, he hit the victim "[m]any times." To his knowledge, the defendant was at the other end of the driveway when the fight began, and Graves did not see him at all during the fight. Graves said he stopped fighting when the victim got up off the ground at one point and then fell back down, and that they all left the victim's residence after that.

Graves explained he had accompanied his mother to the victim's home out of concern for her safety because he knew how the victim had acted in the past. He could tell the victim had been drinking because he could smell alcohol. Graves denied that the defendant had "rall[ied] in the troops," testifying that he had taken it upon himself to meet his mother at the victim's home after the defendant telephoned to tell him where his mother was headed. He had not known that the defendant would show up as well. He said he was not under the influence of any drugs or alcohol that night, and that he had not filed a warrant against the victim because he had not felt the need to do so. He had not been seriously injured and had not needed to see a physician.

Mrs. Wellman testified that Jennifer was hysterical as a result of her conversation with the victim and Howard, Jr., was so upset he kicked and punched holes in his bedroom wall. Jennifer would not give her the victim's telephone number because the victim had told her that Mrs. Wellman would go to jail if she called the victim. She therefore decided to go to the victim's house to talk directly with him about the situation. Mrs. Wellman explained why she felt the need to talk that night with the victim: "This problem had to be resolved. You don't hurt children, and tell them they can't see you anymore until they're eighteen, deny them from their other brother and sister. That's not right. You scar a children's [sic] heart like that."

Mrs. Wellman testified that when she reached Clendenin Road, where the victim lived, there were no streetlights and consequently she was unable to find his house. She said she was driving back and forth still searching when the defendant and her oldest son, Sam, Jr., who were in separate cars,[3] stopped her on the road. After she explained the situation to Sam, he accompanied her to the victim's house in his own automobile and walked with her to the door, where she had to knock several times before the victim appeared. When she asked the victim why he was hurting Jennifer he "proceeded to cuss [her] like [she] was the lowest piece on the face of [the] earth." Sam told the victim to stop cursing her, and the victim then began cursing Sam, calling him "every name in the book" in an effort to get him to come up on the car after him. She put her hand on Sam's shoulder and told him not to get on the car, and he did not. The victim then began kicking at Sam with his foot, "trying to entice [him] up on [the] car."

Mrs. Wellman testified she next heard a "crunch, crunch, crunch" sound and looked over to see the defendant walking up the back of the victim's car. When the defendant reached the back

---

[3]The defendant later testified that Michael Graves was driving the vehicle in which he was riding.

glass of the vehicle, the victim came out of the house, kicked out with his foot, and then ran toward the defendant. The defendant grabbed the victim in order to dodge him, and the two men ended up near the edge of the trunk. Sam then grabbed the victim and pulled him to the ground, where the two started fighting. According to Mrs. Wellman, the only time the defendant touched the victim was when he grabbed him to avoid his charge on the top of the car. She estimated the fight between her son and the victim lasted about three or four minutes, and testified that Sam twice let the victim up when he announced he had had enough. The first time Sam released the victim, the victim again stated his intention of "kick[ing] his butt"; therefore, Sam "wrapped him right back and started on him again." The second time Sam released him, the victim got a metal rake and turned to go after Sam with it, but fell to the ground instead. Mrs. Wellman insisted that she and her son had no intention of starting a fight when they went to the victim's home. She acknowledged on cross-examination, however, that she was upset when she arrived at the victim's home and that she had not been invited to come.

The defendant began his direct examination testimony by stating that he had served on active duty in the United States Marine Corps from 1981 to 1986 and was currently in the Tennessee National Guard. He testified he was home with his wife and her thirteen-year-old twins on the evening of March 31, 2000, but did not know anything about the telephone conversation that had occurred until "after the whole evening was done." However, he did hear his wife announce where she was going as she left the house. His attempts were unsuccessful to get her to stop and tell him what was wrong. The defendant said he was concerned for his wife's safety because he knew of the victim's history of violent behavior towards her, including the relatively recent incident that was the basis for the order of protection she had taken out against him. Therefore, he first telephoned Sam Graves, Jr., who lived closer to the victim than he did, and asked him to meet him at Clendenin Road and then had Michael Graves drive him "up that way."

The defendant testified that he and Michael met Sam on the road and then followed him to the victim's house to see if Mrs. Wellman was there. When they did not see her car, they "h[u]ng out back down [a] street" until they saw her drive by and pulled her over. Sam asked if she was sure she wanted to talk to the victim, and she said she was. Sam told her he would go with her and they all drove their separate vehicles to the victim's house, parked in the driveway, and got out. Mrs. Wellman, Sam, and Michael then walked together to the victim's door, while the defendant stayed back beside a tree in the shadows.

The defendant testified that the victim cursed Mrs. Wellman and Sam cursed back, jumping in front of his mother and trying to get to the victim. Mrs. Wellman held Sam back, and the victim began "swinging his leg back and forth" at Mrs. Wellman and Sam. The defendant said he started walking forward at that point because the situation was escalating, and he went up on the car when he heard the victim call Sam up to fight. He denied, however, that he ever kicked or punched the victim, testifying that the only physical contact he had with the victim occurred as he tried to get himself out of the victim's grasp after the victim had charged him. The defendant described what occurred from the time he moved forward to the car:

When I got to right here, I heard [the victim] tell Sam -- nicely put, anyways -- is, come up here, and we'll fight. Well, I figured that would be an invitation for me to get up there and get in the middle of it, in between them.

I walked up and over. When I got right here is when he noticed me. All right. And at that point, he tried doing a -- swinging a kick, like this, for some reason; at which time, I turned to the side and fell, and caught the doorway, which put me at about that type of angle right there. His attempt was to hit me, and that's when I saw him go by me because I wasn't there. I turned around. He was up on the roof. He was about right here on the roof.

I don't know what happened between here and here, but when I turned around, he was up on the roof. And he basically hunkered down and started to charge at me on top of the car. We met about right there in the middle. I met him. And he bear-hugged me, which I slipped out of the -- I -- from what I'm understanding, it may have been because Junior [Sam Graves, Jr.] had his leg or whatever. I don't know. That was down here. The confrontation for me was right here.

Contact was broke. We basically both faced outside the vehicle, right here, on the edge. I was doing this thing right here (indicating). I was losing my balance. He was losing his balance. He came down first. And he got up. Junior was standing right about here. He saw Junior, and he was starting at -- making an aggressive move toward him, and they mixed it up. All right.

The defendant testified he stayed out of the fight between Graves and the victim because, in his opinion, Graves was not using excessive force on the victim. He corroborated Mrs. Wellman's testimony that Graves let the victim go twice during the fight, only to have the victim come after him again, the second time with a metal rake. The defendant also corroborated Mrs. Wellman's testimony that the victim fell to the ground after retrieving the rake. At that point, he said, he walked over to the victim, replaced the rake against the side of the house, knelt beside him, and said, "Don't you ever touch my wife again." He and the others then left the victim's residence.

On cross-examination, the defendant repeated his belief that the victim's call to Graves to come onto the car to fight was an open invitation to "all comers." He acknowledged his basic training in the military included training on how to fight, but denied that he directly caused any of the victim's injuries.

The jury found the defendant guilty of assault, recommending that no fine be imposed. Before announcing the verdict, the jury foreperson also asked the trial court if the jury could recommend leniency in sentencing. The trial court informed the jury that its only role in sentencing was to determine whether or not a fine should be imposed. Thereafter, the trial court polled the jury by asking each member to raise his or her hand to indicate that the jury was finding the defendant guilty of assault and was not setting a fine. The record reflects that each member so indicated.

## Sentencing Hearing

The defendant testified at his December 10, 2001, sentencing hearing that he was the son of a minister and originally from California. He had a high school diploma and had gone through some trade school while in the military, where he had spent four and one-half years on active duty in the Marine Corps and five or six years with the Army National Guard. He was currently serving in the Tennessee National Guard and was in good standing. He had worked in the past in either the construction field or as a cook, but was between jobs at present and considering moving back to California, where his mother and sisters still lived. The defendant said he had "an interview with a casino . . . for a cooking job there" that was to be held as soon as he could return to the state.

The defendant acknowledged his driver's license had been revoked and that he had two convictions for driving on a revoked license. He testified, however, that he did not currently drive and that the payment of his suspension fees was the only thing holding up the reinstatement of his license. He said he had been out of the state and had not had any recent contact with the victim. Asked by his counsel if he could think of a better way to have handled the situation with the victim, the defendant replied:

> Well, from the very start, the only thing I could have done is what I did. The only thing I could have done was stayed out of it and watched my wife go to jail, I reckon. Or the boy. That's the only thing I can see different, from where I sit at.

The defendant said he could comply with any conditions of probation the trial court might impose.

The trial court made the following sentencing determinations:

> Based upon the verdict of the Jury, it is the judgment of the Court that you are guilty of assault. No fine was imposed by the Jury. An 11-month and 29-day sentence is imposed. You will serve 90 days of that sentence in jail, the balance on probation. You will be furloughed for Guard duty, eligible for work release, and attached with the court costs, of course.
>
> Now, the enhancing factors that I considered were that the bodily injury suffered by the victim was particularly great for a

misdemeanor assault. And [the defendant] has a prior history of criminal convictions, including one assault conviction irrespective of the fact that it was a domestic situation and a no-contest plea.

I considered in mitigation and not making him serve more time, these were unusual circumstances. And it's doubtful that a sustained intent to violate the law motivated his conduct, but that still wasn't sufficient to rise to a defense in the mind of the Jury.

The rehabilitation question, [the defendant] has no drug or alcohol problems or anything else. This was -- I don't think rehabilitation is really that big of an issue here. I'm not going to order any kind of anger management courses or any of that kind of stuff. I am going to say that [the defendant] is to have no contact with [the victim] or anyone in that family while on probation.

Thereafter, the defendant filed a timely appeal to this court, challenging both the sufficiency of the evidence and the trial court's sentencing determinations.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first contends the evidence was insufficient for a rational trier of fact to find him guilty of assault beyond a reasonable doubt. He concedes the victim sustained injuries, but asserts that the proof at trial showed that the injuries were caused by Sam Graves, Jr. In support, he points, *inter alia*, to Graves's and Mrs. Wellman's testimony, as well as his own, that the only fight that occurred was between Graves and the victim. The State contends the evidence supports the defendant's conviction.[4]

When the sufficiency of the convicting evidence is challenged, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State

---

[4]The copies of the State's briefs submitted to this court are missing page seven, which covers a portion of the State's argument on the sufficiency of the evidence. The missing page was not, however, necessary for our review of this issue.

v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The indictment in this case charged the defendant with assault for intentionally, knowingly, or recklessly causing bodily injury to the victim. See Tenn. Code Ann. § 39-13-101(a)(1) (1997). Viewed in the light most favorable to the State, the evidence at trial showed that the defendant ran up the hood onto the roof of the victim's car and "dropkicked" the victim in the leg, rupturing the ligaments in the victim's left knee and causing the victim to suffer an abrasion to the top of his head from his fall to the ground. The evidence further showed that the defendant straddled the victim as he lay on the ground and punched him several times in the head, fracturing the victim's nose and causing a great deal of bruising about the victim's eye.

The defendant argues that his testimony, as well as that of Mrs. Wellman and Sam Graves, Jr., shows that the victim's injuries were caused by Graves, and the victim's testimony that he "dropkicked" the victim while standing on the roof of the car "borders on the incredible." The victim, however, testified that he did not fight with Graves and that it was the defendant, not Graves, who kicked him in the knee when they were on the car and then punched him in the face after he had fallen to the ground. The victim's wife also testified that she saw the defendant in a punching motion crouched over the victim on the ground, while Graves and his mother stood nearby. By finding the defendant guilty of assault, the jury obviously chose to accredit the witnesses for the State over the witnesses for the defense. This was its prerogative as the trier of fact.

The defendant additionally argues that the jury foreperson's question regarding whether the jury could recommend leniency in sentencing demonstrates that the jurors must have had doubt about his guilt of the offense. We disagree. The jury foreperson did not wait for the trial court's answer

to the question before announcing that the jurors had unanimously found the defendant guilty. Moreover, after the trial court had explained that the jury's role in sentencing was limited to setting a fine, each individual juror affirmed the guilty verdict by raising his or her hand. We conclude, therefore, that the evidence was sufficient to sustain the defendant's conviction.

## II. Sentencing

The defendant contends his sentence is excessive given the facts and circumstances of his case. He argues the trial court erred in its application of enhancement and mitigating factors and asserts that his stable social history, fairly stable employment history, military service, lack of drug or alcohol abuse, and minimal criminal history all weigh in favor of a sentence of either full probation or a substantially shorter period of confinement. The State contends the trial court's sentencing determinations are supported by the record and in full accordance with Tennessee's sentencing guidelines. We agree with the State.

Misdemeanor sentencing is controlled by Tennessee Code Annotated section 40-35-302, which provides in part that the trial court shall impose a specific sentence that is consistent with the purposes and principles of the 1989 Sentencing Reform Act. See Tenn. Code Ann. § 40-35-302(b) (1997). Although the Sentencing Reform Act typically treats misdemeanants and felons the same, misdemeanants are not given the presumption of a minimum sentence. See State v. Seaton, 914 S.W.2d 129, 133 (Tenn. Crim. App. 1995). A separate sentencing hearing is not required in misdemeanor sentencing, but the trial court must "allow the parties a reasonable opportunity to be heard on the question of the length of any sentence and the manner in which the sentence is to be served." Tenn. Code Ann. § 40-35-302(a) (1997). A misdemeanor sentence, unlike a felony sentence, has no sentence range. State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997).

The trial court has great flexibility and discretion in fashioning a misdemeanor sentence. The sentence must be specific and in accordance with the principles, purposes, and goals of the 1989 Sentencing Act. Tenn. Code Ann. § 40-35-302(b); State v. Palmer, 902 S.W.2d 391, 393 (Tenn. 1995). The trial court should consider enhancement and mitigating factors in making its sentencing determinations; however, unlike the felony sentencing statute, which requires the trial court to place its findings on the record, the misdemeanor sentencing statute "merely requires a trial judge to consider enhancement and mitigating factors when calculating the percentage of a misdemeanor sentence to be served in confinement." State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998). The trial court is authorized to place the misdemeanant on probation either immediately or after a term of confinement. Tenn. Code Ann. § 40-35-302(e) (1997). When a defendant challenges a misdemeanor sentence, this court conducts a *de novo* review with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d) (1997).

The trial court found two enhancement factors applicable: the defendant had a prior history of criminal convictions or criminal behavior, and the personal injuries inflicted upon the victim were particularly great. See Tenn. Code Ann. § 40-35-114(1), (6) (1997). The court also found mitigating factor (11), the defendant committed the offense under such unusual circumstances that it was

unlikely a sustained intent to violate the law motivated his conduct, see id. § 40-35-113(11), applicable, but apparently did not give it much weight.

The defendant's presentence report reflects three prior convictions: a 1991 conviction for driving on a suspended license; a 2001 conviction for assault with an offense date of February 16, 2001; and a 2001 driving on a revoked license conviction with an offense date of January 23, 2001. The defendant argues the trial court should not have considered the 2001 convictions in applying enhancement factor (1) because those offenses occurred after the assault in the instant case. However, as the State points out, this court has held that the trial court may consider, for the purposes of enhancement factor (1), any prior convictions or criminal behavior that occurred before the sentencing hearing, "regardless of whether the convictions or behavior occurred before or after the criminal conduct under consideration." State v. Ed Waters, No. 01C01-9106-CR-00158, 1992 WL 28457, at *3 (Tenn. Crim. App. Feb. 20, 1992), perm. to appeal denied (Tenn. 1992); see also State v. Servando Galvan, No. 01C01-9807-CC-00313, 1999 WL 618997, at *4 (Tenn. Crim. App. Aug. 13, 1999), perm. to appeal denied (Tenn. 2000). Thus, we conclude the trial court did not err in applying this enhancement factor, or in weighing it heavily in its determination of the percentage of the sentence to be served in confinement.

The defendant next argues that enhancement factor (6), the personal injuries suffered by the victim were particularly great, see Tenn. Code Ann. § 40-35-114(6), should not have been applied because the victim's bodily injury was an essential element of the offense. However, although bodily injury was an essential element of the defendant's indicted offense, serious bodily injury was not. Because there is ample evidence in the record that the victim sustained serious injuries, we conclude that the trial court did not err in applying enhancement factor (6) in determining the appropriate sentence.

The defendant also contends that the trial court erred in its application and weighing of mitigating factors. He argues that mitigating factor (11), the offense occurred under such unusual circumstances that it is unlikely a sustained intent to violate the law motivated his conduct, see id. § 40-35-113(11), was entitled to greater weight, and that mitigating factor (2), the defendant acted under strong provocation, see id. § 40-35-113(2), applies and is entitled to great weight. He also proposes that factors such as his stable social history, service record, minimal criminal history, lack of drug or alcohol abuse, and fairly stable employment history should have been applied as mitigating factors under the "catchall" provision of Tennessee Code Annotated section 40-35-113(13). However, we find no error in the trial court's application of mitigating factors. The trial court noted with respect to mitigating factor (11) that although it was doubtful a sustained intent to violate the law motivated the defendant's conduct, the circumstances of the assault had not been sufficient to rise to the level of a defense in the minds of the jurors. As for the defendant's proposed mitigating factor of sufficient provocation, we note that the defendant and his family went uninvited to the victim's home to initiate the confrontation, and neither the defendant nor his wife mentioned in their testimony anything about the victim's kick having made contact with Graves's body before the defendant rushed onto the car to fight the victim. In sum, we conclude that the trial court did not err in its application or weighing of the enhancement and mitigating factors.

A trial court may base a sentence of confinement upon any one of the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently have been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1) (1997). A finding that confinement was necessary to avoid depreciating the seriousness of the defendant's offense is implicit in the trial court's ruling in this case. In ordering that the defendant serve ninety days of an eleven-month-twenty-nine-day sentence in the county jail, the court noted not only the defendant's prior criminal history, including his conviction for assault, but also that the "bodily injury suffered by the victim was particularly great for a misdemeanor assault." The record reflects that the trial court considered the facts and circumstances of the case and observed and followed the principles of the 1989 Sentencing Reform Act in determining the defendant's sentence.

## CONCLUSION

We conclude that the evidence was sufficient to support the defendant's conviction for assault and that the record supports the trial court's sentencing determinations. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-13-